This afternoon is 4-19-0010, Cannell and Whittaker v. Tittsworth. So for the appellant, Walker Philbert, you are here, sir? Yes, sir, I am. And for the affilee, Michael Holohan, you are here, sir? Yes, sir. We ask counsel to be here early because we might be, not with the previous one, ready to go early. And be here a half hour early. Both of you are here and I want to thank you for that. Because here we are and able to start early and we appreciate your courtesy in doing that. So without anything further, Mr. Philbert, you may proceed. Thank you, Your Honor. And thank you for the kind words. I've had the pleasure of practicing with Mr. Holohan and Fitzgerald for a long time. So it's kind of a pleasure to be here. Sure. Obviously, I'm Walker Philbert. I'm here for the appellants. And thank you, Mike. And thank you, Your Honors. And may it please the Court. Counsel. If I may, I'm just going to start my way with an example, Your Honor, that we're in a very formal setting here this afternoon. And hypothetically, if I were to come in right at the beginning and say that it's my belief that this corrupt court should take its time and follow state laws, and that I will not support the forging of your documents by this court, and that the orders of this court is just another example of your corruption and your forgery. That is the almost similar case that my clients ran into in a formal setting of the Eldora. Well, it would be bad form. Of the Eldora Village Council. And I'll be the first to admit, Your Honors, that my clients have a very steep burden in this entire matter. But if I could start at the beginning, we have three allegations, words, words matter, where Mr. Tipsworth indicated that my clients were corrupt, that they had forged documents, and that they had been part of the citizens of Eldora. And I believe under common law and Illinois case law, that words such as that that would impute the commission of a crime or inability to perform their official functions does rise to the level of defamation per se. And as such... It doesn't have to be false. I mean, I know the trial court, and I appreciate Judge Virtue's careful analysis here, essentially is saying, yeah, some of this stuff may have been criminal. Is it criminal only if the state's attorney brings charges and a conviction occurs? Or could someone express an opinion that this is criminal? Well, you are correct that it has to be a false statement. The truth is an absolute defense. But where we feel the lower court erred is that the defense did not put on sufficient proof to show that those specific allegations were false. Now, granted, we were dealing with plaintiffs here who were novice citizen legislatures in a small town, and I'll be the first to admit, and I think there's plenty of evidence at the trial, that errors were made. And there might have been problems. But as to the specific words, corrupt, which has a specific meaning, defraud, which has a specific meaning, and forgery, which has a specific meaning, that in those instances the defense did not bring forward any evidence to show that my clients were engaging in those specific activities. Namely, trying to do something to get money into their own pockets or they were actually taking documents and passing them off. Is it our stand and review in this case to manifest the weight of the evidence? I would agree with that, Your Honor. Because if the trial court is of the opinion that whether they're charged or not, some of the evidence presented demonstrates that maybe the plaintiffs, with regard to the complaints made by Mr. Tisford, were engaging in criminally corrupt activities. If there's some evidence to that effect, isn't it in a defamation manner the burden on the defendant or the plaintiffs to demonstrate that it isn't true, as opposed to the burden on the, I think that's the British system, for the defendant to demonstrate that it is true. I think I might mistake it, but go ahead. No, I understand your point, Judge, but if I can drill down just a little bit more. When we're talking about corrupt, the definition of that is doing something dishonestly in return for money or personal gain. And defraud is illegally obtaining money from someone by deception. But that's not the only definition of corrupt, is it? Well, it might be corrupt to do something for a legal purpose, or corrupt because you made a decision to support a friend, even if you don't have any military benefit from it. I would agree that there might be some other definitions, but my point is that the record does not support any evidence to suggest that my clients were engaging in corrupt activity. They might have been doing some things incorrectly, but they weren't corrupt. They certainly weren't trying to line their pockets. And on the defraud part, they certainly weren't trying to do anything to get money from the citizens of Aldera and try to put that into their pockets. There's absolutely no evidence that that occurred whatsoever, and it's also uncontroversial that my clients had presented statements that were admitted to the affidavits by agreement that they had not engaged in that activity. Along the lines of what Justice Steinman was just asking about, or indicating that there are multiple definitions of corrupt or fraud, doesn't case law tell us that we're to apply or give the meaning that would be the innocent meaning? In other words, where it would not be defamatory? The so-called innocent construction rule. That's it. Well, that's an excellent point, but I think what you have to look at is the totality of the circumstances. What we're actually looking at here are documents that are being presented by the village president that are in most instances labeled veto of minutes, which is not a power that a president of a village has to veto minutes. And so he's putting together this document ostensibly saying that I'm going to veto these minutes and I don't agree with that. And then if you look at it, in most instances there's a statement that kind of comes somewhat out of the blue that either says, you know, these people are conspiring to defraud the village presidents of, in one instance, $14,252. In another instance, there's kind of a tag-on sentence at the end of this veto message that says, you know, the state's attorney finds that these forgeries are those documents, so be it. Another one right at the end, this court should use its time following municipal codes and state laws. They're really not, they're almost non sequiturs into what he's trying to say. Which would probably be a good indication that he didn't mean them as terms of art, did he? I would disagree. I think it's proof in the other direction that he knew exactly what he was doing, that he was trying to make these defamatory, if you will, statements to really tar and feather these people. Who did he identify these people? Well, thank you for that, because that's an excellent point, too. At no time, and I'm going to give Mr. Tittsworth some credit here, at no time did he single out these individuals by name. But just like I used in my example at the beginning of my argument, when I said the court, if the court did that, it's common knowledge who the members of the board are, just as it's common knowledge who the members of this court are. But they weren't all in that faction, to use a term that was referenced. They weren't all part of one faction, were they? Well, they were members of the board. Well, how many total board members were they? At that particular time, I believe there were five in addition to the board's president. And how many of them were people who didn't get invited to the special meeting on September 2nd? Well, I think the people that would be on Mr. Tittsworth's side did not attend that special meeting. So it would be three? I believe so. So that leaves two or three more? Two who were on Mr. Tittsworth's side or two on my side or your side? We would have three. Okay. How many are plaintiffs? Well, we started out with three, Your Honor, and we only proceeded at trial with two, who are the two appellants here today. So the defendant didn't identify by name the individuals who were the subject of these allegedly defamatory comments. Again, doesn't the case law indicate that that then doesn't constitute actionable defamation? Doesn't he have to identify the individuals? Well, Your Honor, I believe there was part of the petition, a complaint that was filed. I really didn't get much discussion at the trial, but it is part of the complaint that there was a newspaper article in a newspaper called the Newspaper Paper of Ferry, Illinois, that specifically mentioned my client's name and allegations that were made by Mr. Tittsworth as laid out in these vetoed messages. Another question, you identified three terms, corrupt, defraud, and forgery. I'll grant you the third term that has a pretty narrow definition and really not many innocent meanings under the dictionary definition. But when you go back through and look at the comments made by the defendant, I have to question whether or not he understands what the term forgery means. Because when he says, I will be contacting the state as to these matters, and if charges are brought against the ones who voted for and took part of the forgery of these village documents, so be it. And he was talking about the minutes, stating that the President called for a debate to end, and he says, never did I call for debate to end. And apparently he's referring to that as the forgery of the village documents. And then at another point said, I do not and will not support the forgery of village records as voted by the board. It, to me, is apparent that he wasn't describing forgery. He was describing something that was not forgery, but used the word forgery. Isn't that something we should look at to determine whether or not these were truly defamatory words? Absolutely, but I'm going to button hook it back in the other direction, Your Honor, because to me, that's proof right there of recklessness. And that's a component of malice when you're making a statement. He is throwing out a word forgery, and the standard is what that word means and what third parties who are looking at that word and what that word means. So third parties are reading a word that says, oh, these people are guilty of forgery, they're forgers. And if Mr. Titsworth, and I believe he hit it right on the head, didn't understand what that word meant, and he was recklessly using it in these documents to try to harm my clients. And that right there goes to the issue of malice in his use of these words. And, you know, real briefly, that's the other big hurdle that my clients have to get over because of the New York Times standard, because everybody here is a public official. So I agree with you that he didn't understand what he was doing, but he was using a word that has a common meaning that third parties are going to see that and think that, oh, there's criminal behavior going on. So real briefly, that brings me to the other issue, which is the absolute privilege issue, because we're talking about a president vetoing, even though that's not a power that you can exercise under the municipal law. There has to be some connection to these proceedings. And if you look at the totality of what's before us here, these statements are pretty much codas to everything else that's being discussed. They're kind of tack-on statements, and they're used to, quite frankly, deter and feather my clients, and we feel rise to the level of defamation. As to the issue that Mr. Holligan is going to talk about, I believe, on damages, I believe the case law is clear on defamation per se, that you don't have to prove damages. Unfortunately, we never got to that issue on a court level, because Judge Burge ruled against our clients. So all I would ask is that, under the totality of behavior, that the court find that there was defamation per se, that there was malice on the part of Mr. Pittsburgh for using the statements, that he was not making the statements within the proceedings that were going on in that public hearing, and that he find that he did engage in defamation against my clients, and that he reversed the judge's finding on that, and remanded for further discussion of any damages. Thank you, Counselor. Mr. Holligan, sir? Thank you. Counselor, I appreciate the kind words from Mr. Gilbert. Also, it's been a while since I've done this. Well, welcome back. I haven't been in this building. I think I've been here before, Your Honor, once in the old building, but it's been a while. Oh, there are, I think, 100 people in rural Pike County. Fairly peaceful place for a period of about four years this past year. You say what? Peaceful. Peaceful. Very peaceful community. The record would indicate otherwise. Except for about a four-year period, Your Honor. I think we had Mrs. Sutton testify, who's been a long-time member, about how things got along. So, I think this case almost would be a better example for maybe government students to see how American government acts at the very basic level. You know, we have hard-to-find five trustees in a town this size. They're almost always, as you know, related. Everybody's related in some way. The new Village Board President is the daughter of Mr. Scranton, who figures in prominently in this situation. How many people in the village? I think about 100. That might be it. It's not the smallest village in Pike County. We have one that's got 20, and they're both incorporated, but very small. I just think I wasn't involved, other than as an observer, until I was retained in this case. But I remember years ago when we talked about Chicago, and we had Beirut on the lake. Well, this was Beirut on the prairie. I mean, I don't know what else. I mean, the record indicates domestic violence proceedings between all of them, I mean, involving city officials. I'm not sure that the legislature intended domestic violence to be used for that purpose. Judge McCartney, I don't think, granted any of those. But we had this whole situation that went on. So Mr. Overton talks about his contempt for it to engage in activities by some diabolical individual that was planning this. I mean, he's elected. He served one term. I don't think he went into any agenda to go after these other individuals, but it did deteriorate to a—it was not a level that any of us would be too happy to be. My client used words that I would advise him to use, most likely not. They didn't have a legal attorney. I mean, this is what you get. I got caught in this myself one time. The counsel said I should be allowed to talk to the mayor without one of them being present. That's not untypical in these kinds of states. So if you have—if he wants to get an attorney, but he goes to appoint somebody, they won't approve him. They're trying to hire attorneys. Mr. Golder was mentioned, Mr. Beard was a former Adams County state attorney, and Mr. Kuhnert came in later to Winchester. I mean, they finally get to the point where they can read upon this. That's what I would call it. It doesn't have an attorney. Confronted with these situations, what do you do with minutes that you know are wrong? I mean, is it veto the right way to do it? Perhaps not. But if the president doesn't make a notation that there's something wrong with those minutes, then the record wouldn't be complete. And you have a situation where you have three minutes to—and then the clerk decides with the three. So what control is there over me having accuracy of the minutes? Okay. He used the word forgery. He accused plaintiffs of forgery. How did—are you saying that he didn't say that? Or if he did, that it was true? I'm sorry, I'm not— where not everybody was there, and he was constantly complaining. The clerk was drafting the minutes, and the clerk acted. I think that inaccurate would have been a much better word than forgery. He used the word forgery. You know, sometimes— So are you saying that he misused the word forgery? The court raised that in the argument with Mr. Porter, whether he understood it. I don't know if he understood it. It seems to me that he used the word forgery, meaning, as he used it, it was inaccurate. I think that's how he interpreted it. That may not be the general definition, but that's what the whole situation was with the minutes being prepared by a clerk who signed with the other three. We can't be— I'm sorry. We can't be too loose about this. If you were accused by someone in public of having committed forgery by forging a signature on a will, that would be actionable conduct. That would be defamation. You have an accusation of forgery there, and unless the speaker could— that would be subject to damages. Here, your client accused plaintiffs of committing forgery. How does he get out from under that? Well, the question would be if they're inaccurate documents, is that a forgery. Secondly, we've got the athlete's privilege. I mean, it took place in the context of— But how is that forgery? Well, it depends on what the devil—how the court's going to define forgery. The trial court did not use that. It was used by him in the context that was there about these minutes to be forged. And that's the way it was interpreted. I think sometimes we get this—we'll use the word fraud. Well, is fraud in the civil sense the same as fraud in the criminal? You make that accusation. I don't think it was something indicating that the action where they went to the state attorney may have been more involved in the Criminal Information Act violations, the Open Meetings Act violations that took place, and some of the other things. I'm looking at a definition of forgery as defined by blacks, and I can tell you it doesn't fit with what I read here. The best I can discern here is that the defendant didn't know what forgery meant because what he was describing and then saying, that's the forgery, the two don't match. If that is the case, is there—what is the proposition of law here that then is applied to make that not actionable? Well, I don't think he understood. I mean, I wasn't there. I wasn't the city attorney. But I think from just his testimony and how he was asked, he didn't know. So, but it's done in the—I think the only way it takes to talk about it when it's done— you can call somebody a liar and a cheat. In the Lanello Fitzgerald case and the council are very— the zoning variation, I mean, what's the difference? I mean, it's done in the city council. It has to do with city business. It had to do with these minutes and what was done. And even with the narrow definition of forgery, I think it's protected in that context. Is it a good choice of words? No. But I mean, from that point, you know, it's what was used. And, you know, I know we didn't get into Dick Ferguson to address the issue of damages because I don't think there were any, but we never got to that point. But I know at this stage it wasn't a good word to use. I don't think he knew what it meant. Did that give rise to the actual work that's done in the context of this new information? And the reference the council made to something being placed in the paper, I don't think my client's responsible for something reported by a newspaper, but their interpretation, they had names, and that wasn't stated by him in the veto message of the case. So to see what he was doing and where he didn't have counsel probably could have been some different way to do it. But he had counsel because they can't agree to get a village attorney. So he's issuing these veto messages. Is there something else could have been done? Probably something different. But the point was he was making a record that these weren't accurate. So when you go to the other points raised by plaintiffs in their case, clearly there were violations of the Open Meetings Act. That one, the three of them got a meeting together, and I think what's clear on that, they didn't want Cecil Stratton to do the work because he volunteered to do it. He wanted to do it for $14,000, which he didn't have. So that was a violation there. There was the Freedom of Information Act request that weren't met. And then there's the big problem where there's this usurping of the mayor's authority. They wanted to pass ordinances about who hired the lawyers, who could meet. Those are clearly not allowed by the old mechanism. So is there criminal action on their part? It certainly looks like it's corrupt. I think they're defrauding the people of Alteria of good government. And the word forgery is the problematic word. I don't dispute that. It was used. It had a narrow definition. It was used in the context of dealing with these village board minutes. He used forgery, not accusing them of trying to profit, but they were doing something that he felt was wrong under the municipal code to him as a layperson that appeared to be a forgery. And that's the word he used. I don't think he understood that. And I think when you put it in the context of what he was addressing, it was inaccurate minutes. Now, it's not an excuse, but these aren't sophisticated operations. They don't have village employees. The trustees think they're administrators. Sometimes you have to tell them goodwill. But that's what exists in these small communities. And that's the choice. So it's fairly clear. I mean, what was there or something there is what we have in this meeting. They don't reference anybody. I don't think we can read into the fact who it is in this newspaper who parses the dollars and decides who to put their name in there when the statistician chose not to do that. So I think that's what it boils down to. It was done in the context of these certainly interesting meetings. They made the newspaper made a whole lot more newspapers I think during that period of time. I know the guy read them and see what was going on. And that was before I was involved in the case. But I think that is our position. It's what Judge Birch adopted. I don't think there's sufficient basis to overturn it. Thank you. Thank you, Counsel. Mr. Philbert, any rebuttals, sir? Thank you, Your Honor. But I'm just going to stand on my reputation for that. And again, I thank Mr. Hallihan. It's always a pleasure to work with him. Okay, Counsel. Well, thank you. And Mr. Hallihan, it need not be 20 years before you next come back to the federal court. We'll be in recess until next week.